UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CLARENCE BRITTEN, #Y32384  )<br>  )<br>  Plaintiff,  )<br>  )  Case No.: 21-1035-SLD<br>vs.  )<br>  )<br>WILLIAM COX, et al.,  )<br>  )<br>  Defendants.  )  | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

NOW COME the Defendants, BRYAN BIROS, WILLIAM COX, ANTHONY LESLIE, DARRYL LEWIS, KYLE MILLER, and WILLIAM SHELTON, by and through their attorney, KWAME RAOUL, Attorney General of the State of Illinois, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D), provide their Motion for Summary Judgment and Memorandum in Support Thereof, stating as follows:

### INTRODUCTION

Plaintiff is currently incarcerated within the Illinois Department of Corrections and brought the instant claims pursuant to 28 U.S.C. § 1983, alleging violations of his constitutional rights while at Pontiac Correctional Center ("Pontiac"). [d/e 1]. After the Court conducted a merit review pursuant to 28 U.S.C. § 1915A, Plaintiff was allowed to proceed on two Eighth Amendment claims against Defendants, specifically: 1) a conditions of confinement claim for the alleged denial of a mattress, and 2) a deliberate indifference claim concerning an alleged denial of medical care in response to back, neck, and left arm pain, in addition to other alleged ailments. [d/e 14, pp. 1-2]. Defendants now move for summary judgment.

## UNDISPUTED MATERIAL FACTS[1]

1. Plaintiff, Clarence Britten, is incarcerated within the Illinois Department of Corrections ("IDOC") and has been at Menard Correctional Center since January 29, 2021. [Exhibit 1 – Plaintiff Depo, p. 8: 7-9].

2. Plaintiff was at Pontiac Correctional Center ("Pontiac") from approximately January 29, 2020 until January 29, 2021. [Ex. 1 – Plaintiff Depo, p. 8: 1-6; Exhibit 2 – Living Unit History, pp. 2-3].

3. Plaintiff suffers from suicidal thoughts and concedes he frequently goes on and off crisis watch in response to such. [Ex. 1 – Plaintiff Depo, p. 17: 14-18].

4. Plaintiff alleges, while at Pontiac, that he suffered a mental breakdown, smeared feces and bodily fluids on the walls of his cell, and was subsequently moved to a crisis watch cell. [Ex. 1 – Plaintiff Depo, p. 12:12-23].

5. Plaintiff concedes, while at Pontiac, prior to September 6, 2020, he always had a mattress. [Ex. 1 – Plaintiff Depo, pp. 19: 23-25; 20:1-5].

6. From September 6, 2020, until November 9, 2020, Plaintiff was housed in the South Mental Health ("SMH") Unit within cells 125, 113, 115 and then 116. [Ex. 1 – Plaintiff Depo, p. 21:1-22; *see also* Ex. 2 – Living Unit History, Bates 000129].

7. Plaintiff alleges when he was placed in the SMH Unit's Cell 125, he was not given a mattress. [Ex. 1 – Plaintiff Depo, p. 21:16-25].

---

[1] The facts are undisputed only for the purposes of this motion.

8. As Plaintiff was on crisis watch, he was permitted a safety blanket and a safety smock, and any other materials had to be approved by Mental Health staff. [Ex. 1 – Plaintiff Depo, p. 22: 1-9, 16-20; Exhibit 3 – Declaration of Shelton; Exhibit 4 – Declaration of Biros[2]].

9. Plaintiff transferred to the SMH Unit's Cell 113 on approximately September 17, 2020. [Ex. 1 – Plaintiff Depo, p. 24: 3-10].[3]

10. Plaintiff subsequently was taken off crisis watch by Mental Health staff, and he was placed in Cell 106. [Ex. 1 – Plaintiff Depo, pp. 28: 1-25; 29: 1-14].

11. Plaintiff contends he did not have a mattress while he was in cell 125, cell 113, or cell 106. [Ex. 1 – Plaintiff Depo, p. 29: 15-17].

12. Plaintiff alleges he spoke with Defendant Leslie on September 7, 2020, informing him (Leslie) Plaintiff did not have a mattress. [Ex. 1 – Plaintiff Depo, pp. 32: 6-25; 33: 1-2].

13. Defendant Leslie indicated he would look into it. [Ex. 1 – Plaintiff Depo, p. 33: 1-6].

14. Plaintiff allegedly spoke with Defendant Leslie several more times on September 7, 2020, requesting a mattress. [Ex. 1 – Plaintiff Depo, p. 34: 2-9].

15. Plaintiff alleges Defendant Leslie told him Defendants Miller and Lewis informed him (Leslie) there were no mattresses available. [Ex. 1 – Plaintiff Depo, p. 34:10-14].

16. Defendant Leslie signed an affidavit stating Plaintiff was suffering from pains and did not have a mattress. [Ex. 1 – Plaintiff Depo, p. 35: 2-9].

17. Plaintiff concedes he did not speak with Defendant Shelton himself. [Ex. 1 – Plaintiff Depo, p. 35: 14-22].

---

[2] Undersigned counsel has not yet received Defendant Biros' signed declaration back as of the time of filing; however, this motion will be supplemented with Exhibit 4 upon receipt of the signed declaration.
[3] Plaintiff's Living Unit History records indicate he was moved from SMH Unit cell 125 to SMH Unit cell 113 on September 11, 2020. [Ex. 2 – Living Unit History, Bates 000139].

18. Plaintiff contends he spoke with Mental Health professionals who reported Defendant Shelton stated he would try to get Plaintiff and other individuals mattresses. [Ex. 1 – Plaintiff Depo, p. 35: 14-25; 36: 1-11].

19. Plaintiff alleges he spoke with Defendant Lewis about a mattress on approximately two occasions on the same day, which he believes took place on or around October 28, 2020. [Ex. 1 – Plaintiff Depo, pp. 36: 12-25; 37: 1-16].

20. Plaintiff concedes Defendant Lewis stated he would look into getting him (Plaintiff) a mattress. [Ex. 1 – Plaintiff Depo, p. 38: 15-18].

21. Plaintiff alleges he spoke with Defendants Biros and Cox on November 5, 2020, which was the only time he spoke to either Defendant about a mattress. [Ex. 1 – Plaintiff Depo, pp. 38: 19-25; 39: 1-17].

22. Plaintiff concedes he heard from mental health professionals that Defendants Cox, Biros, and Lewis were having meetings and trying to get mattresses. [Ex. 1 – Plaintiff Depo, p. 39: 9-17].

23. Plaintiff alleges he spoke with Defendant Miller approximately more than five times over a two-month period concerning his mattress. [Ex. 1 – Plaintiff Depo, p. 42: 12-24].

24. Plaintiff alleges he wrote a "kite" or letter to Defendant Cox, which he alleges he handed to Defendant Cox during rounds on November 6, 2020. [Ex. 1 – Plaintiff Depo, pp. 49: 18-25; 50:1-12; 51:19-25].

25. Plaintiff alleges he also wrote a grievance on October 5, 2020, concerning his missing mattress but did not get a response. [Ex. 1 – Plaintiff Depo, p. 50: 5-9].

26. Plaintiff also alleges he wrote kites to Defendants Miller, Lewis, Miros, and Shelton but did not receive responses to any of the kites. [Ex. 1 – Plaintiff Depo, p. 50: 5-12].

27. Plaintiff alleges Correctional Officer Morgan passed out approximately eight mattresses to other individuals on October 28, 2020, stating Plaintiff did not get one because Defendant Lewis stated Plaintiff was on crisis watch and not approved for a regular mattress. [Ex. 1 – Plaintiff Depo, p. 41: 2-22].

28. On or about October 27, 2020, Plaintiff took his chuckhole hostage in an effort to speak to someone about his mattress, and Defendant Leslie responded by radioing for Defendant Miller who stated he would give Plaintiff a mattress when "they" (IDOC) gave him a mattress. [Ex. 1 – Plaintiff Depo, p. 43: 2-25].

29. Defendant Leslie was assigned to one gallery within Pontiac's SMH Unit, and Defendants Lewis, Shelton, Biros, and Miller were generally assigned to Pontiac's SMH Unit in its entirety. [Ex. 1 – Plaintiff Depo, pp. 15: 18-25; 16: 1-11].

30. Pontiac usually receives its mattresses through the Illinois Correctional Industries Program ("ICI"). [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

31. Individuals in custody at another IDOC facility, who work in the ICI, make the mattresses used at Pontiac. [Ex. 3 – Declaration of Shelton].

32. In 2020, due to lockdowns at IDOC facilities as a result of the COVID-19 pandemic, there was a period of time Pontiac had a mattress shortage. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros; Exhibit 5 – Defendant Leslie Answers to Interrogatories, ¶ 2].

33. Because IDOC facilities were on various levels of lockdowns throughout 2020, the ICI was temporarily shut down, and no mattresses were being made. [Ex. 3 – Declaration of Shelton].

34. Defendants, who do not have the power or authority to purchase items for Pontiac, sought the help of the Business Office at Pontiac in an effort to obtain approval to acquire

mattresses from an outside vendor. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

35. IDOC in Springfield had to approve the purchase of the mattresses from an outside vendor. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

36. Once an acceptable vendor was identified, Defendant Shelton and Mental Health Authority, Dr. Renzi, requested that forty (40) safety mattresses be ordered for Pontiac. [Ex. 3 – Declaration of Shelton].

37. When the mattresses arrived, it was quickly discovered the mattresses were unacceptable in that they could easily and quickly be torn apart. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

38. Because the mattresses posed a safety risk, they were returned to the vendor. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

39. As a result, different safety mattresses were ordered. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

40. There was a slight delay of about a month in the delivery of the second batch of safety mattresses, simply due to the ordering time and shipping. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

41. When the facility finally received acceptable safety mattresses, they were immediately passed out to every individual in the SMH Unit who did not have a mattress. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

42. Safety mattresses are implemented in the SMH Unit because they are not as easily ripped or torn apart. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

43. If a non-safety mattress is used in the SMH Unit, individuals in custody will sometimes destroy the mattress and use the materials to harm themselves or others. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

44. Even though safety mattresses must always be used in the SMH Unit, individuals in custody still destroy their mattress, which also leads to shortages. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

45. If there is no safety mattress for an individual in custody in the SMH Unit, mental health staff may allow that individual to have an extra safety blanket. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

46. Defendants, who are all security personnel, do not have authority to determine the types of property an individual on crisis watch may have. That decision is made by treating mental health professionals. [Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

47. Four or five months prior to the alleged mattress incident, Plaintiff was placed on Naproxen and Robaxin, a medication Plaintiff understood to be like Tylenol or a muscle relaxer, for treatment of pre-existing back, arm, and neck pain in addition to decreased flexion in his left hand. [Ex. 1 – Plaintiff Depo, pp. 54: 14-25; 55: 1-16; 56: 3-17].

48. While Plaintiff was in the SMH Unit from September to November 2020, during the COVID lockdown, medical staff would go to the housing units for med lines to pass medications, conduct sick call, and see individuals. [Ex. 1 – Plaintiff Depo, pp. 60: 24-25; 61: 1-5; Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

49. Plaintiff's medical records indicate he was frequently seen by medical and mental health staff during the applicable time frame. [*See* Exhibit 5 – Plaintiff's Medical Records, Bates 000132 – 000140].

50. On October 14, 2020, Plaintiff was seen by a nurse practitioner concerning his back pain and was given prescriptions (Roboxin and Naproxen) to assist with pain management. [Ex. 5 – Plaintiff's Medical Records, Bates 000136].

51. Plaintiff concedes after November 9, 2020, when he returned to the West Cell House and was off crisis watch, he was given a regular mattress; however, his arm, neck, and back pain did not get any better. [Ex. 1 – Plaintiff Depo, p. 59: 9-17].

52. Plaintiff concedes Defendants are not medical professionals or at least that he does not have personal knowledge whether they are or not. [Ex. 1 – Plaintiff Depo, p. 62: 8-12; Ex. 3 – Declaration of Shelton; Ex. 4 – Declaration of Biros].

## SUMMARY JUDGMENT STANDARD

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. R. Civ. P. 56(a). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986).

In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the United States Supreme Court held that summary judgment is mandatory if there is no genuine issue as to any material fact for trial, "after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 323. The plaintiff must come forward with evidence of a specific factual dispute, evidence that would reasonably permit the finder of fact to find in Plaintiff's favor on a material question; otherwise, the court must enter summary judgment against the Plaintiff. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *Int'l Union of Operating Eng'rs v. Assoc. General Contractors*, 845 F.2d 704, 708 (7th Cir. 1988).

Summary judgment is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Steen v. Meyers*, 486 F.3d 1017, 1022 (7th Cir. 2007); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on the pleadings, but setting out specific facts showing a genuine issue for trial. Fed. R. Civ. Pro. 56(e). Inferences and opinions may not be based on flights of fancy, speculations, hunches, intuitions, or rumors remote from the affiant's experience. *Visser v. Packer Eng. Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Henning v. O'Leary,* 477 F.3d 492, 496 (7th Cir. 2007).

## **ARGUMENT**

**I.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONDITIONS OF CONFINEMENT CLAIM ON THE MERITS.**

The Eighth Amendment prohibits prison conditions which cause the "unnecessary and wanton infliction of pain." *Patterson v. Gilmore*, 974 F.2d 1340 (7th Cir. 1992) (unpublished) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). A prisoner's inconvenience and discomfort, however, both fall outside the Eighth Amendment. *Id.* (citing *Caldwell v. Miller*, 790

F.2d 589, 600-01 (7th Cir. 1986)). An Eighth Amendment claim has two components – objective and subjective. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Therefore, 'extreme deprivations are required to make out a conditions-of-confinement claim.'" *Id*. (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). It is a fact-intensive inquiry to analyze whether an alleged deprivation stripped the inmate of the "minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Gillis v. Litscher*, 468 F.3d 488, 492-93 (7th Cir. 2006). While constitutionally adequate confinement is required, "inmates cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988). "Occasional discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Lunsford v. Bennett*, 17 F.3d 1574, at 1581 (7th Cir. 1994) (quoting *Rhodes*, 452 U.S. 337, 347 (1981)). The alleged condition Plaintiff suffered, specifically a missing mattress, is *de minimis,* not rising to the extreme standard and, furthermore, the record is clear, as conceded by Plaintiff, that Defendants tried to take action to remedy Plaintiff's lack of a mattress. For these reasons, Defendants are entitled to judgment as a matter of law on Plaintiff's conditions of confinement claim against them.

    A. <u>Extreme Deprivation Requirement</u>

Plaintiff alleges he was without a mattress while housed in Pontiac's South Mental Health housing unit ("SMH Unit") from September 6, 2020 until November 9, 2020, when he transferred back to the West Cell House. [UMF 2; UMF 5; UMF 6; UMF 7; UMF 9; UMF 11; UMF 51]. With regard to a conditions of confinement claim, such as the instant matter, the focus is whether the individual was stripped of the "minimal civilized measure of life's necessities," which include shelter, heat, clothing, sanitation, and hygiene items. *Farmer*, 511 U.S. at 834; *Burton v. Downey*,

805 F.3d 776, 786 (7th Cir. 2015).

Plaintiff's allegations may be dismissed as *de minimis* or not rising to the required extreme deprivation, *even when* considered in their entirety. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Isby v. Brown*, 856 F.3d 508, 514, 421-22 (7th Cir. 2017) (finding an individual having to sleep on "a thin, vinyl covered foam mattress laid over a concrete slab" for more than six months does not violate the Eighth Amendment even though it caused the individual back problems); *see also Thomas v. Doe*, 2016 U.S. Dist. LEXIS 94722 at *3 (C.D. Ill. July 20, 2016) (dismissing complaint at threshold review, stating: "the only alleged defect in his mattress was that it was presumably not thick enough. While the thin mattress may have been uncomfortable, nothing suggests that [p]laintiff suffered the type of extreme deprivation required to state a constitutional claim" over a four-month period).

Further, this matter is easily distinguished from *Townsend*, wherein the plaintiff alleged his thin mattress was placed on the concrete floor next to the shower within a "wet" cell, meaning the shower was used and drained on the floor of the cell on which the mattress lay. *See Townsend v. Fuchs*, 522 F.3d 765, 768 (7th Cir. 2008). There, the mattress became "wet, moldy, and foul smelling," and Townsend slept on the wet, moldy mattress for 59 days. *Id*. Here, while Plaintiff did not have a mattress, Plaintiff has presented no evidence that he was forced to sleep on a wet, moldy, or foul smelling surface. Furthermore, Plaintiff concedes he had a pillow and blanket during this time. [UMF 8]. Further, at the crux of the mattress problem, is the fact Plaintiff could not be provided just *any* mattress due to his placement on crisis watch, which required a specialized safety mattress designed to present self-harm or suicide. [UMF 42; UMF 43; UMF 44]. Additionally, unlike other cases where the Seventh Circuit has allowed claims of deprivations to go to trial, this case does not involve allegations of multiple deprivations or that the lack of a

mattress was exacerbated by extreme temperatures or unsanitary conditions. Therefore, the allegations in this matter do not rise to the extreme deprivations required for such a claim, and Defendants are entitled to summary judgment.

    B.  <u>Defendants' Lack of Personal Involvement and Efforts Made to Obtain a Mattress</u>

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. at 837. There, the Court explained that *Estelle* established that "deliberate indifference" indicated "a state of mind more blameworthy than negligence." *Id.* at 835 (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). The official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must actually draw the inference. *Id.* at 837. Prison officials cannot be held liable for deliberate indifference if they either (a) did not know, or had no reasonable reason to know, of the substantial risk, or (b) responded by making some effort to prevent the harm, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844-45. *Farmer* states that officials cannot be held liable when they "respond reasonably" to the risk. While this is certainly true, a reasonable response is not necessary to avoid liability, because the standard for deliberate indifference is stricter than negligence, or even gross negligence. *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006)).

Further, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). The Supreme Court expressly rejected an implied state of mind in cases alleging

"continuing" or "systemic" conditions and noted actual state-of-mind is required. *Wilson v. Seiter*, 501 U.S. 294, 2323-2326 (1991).

Plaintiff fails to establish Defendants' personal involvement and/or knowledge of the alleged deprivation of a constitutional right as required in § 1983 claims. *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 1996); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Gentry*, 65 F.3d at 561; *Duckworth v. Franzen* 780 F.2d 645, 649 (7th Cir. 1985) ("official sued in his or her personal capacity can only be held liable for his or her individual wrongdoing").

Here, the record reflects and Plaintiff concedes Defendants took action to attempt to remedy the fact Plaintiff was missing a mattress; however, the unforeseen circumstances of the global COVID-19 pandemic caused a mattress shortage, which was further complicated by the fact Plaintiff required a specialized mattress designed to prevent self-harm. [UMF 30; UMF 31; UMF 32; UMF 33; UMF 34; UMF 35; UMF 36; UMF 37; UMF 38; UMF 39; UMF 40; UMF 41; UMF 42; UMF 43; UMF 44]. Plaintiff suffers from suicide thoughts and frequently is placed on crisis watch. [UMF 3; UMF 4]. During his time on crisis watch, Plaintiff is permitted a safety blanket and safety smock, and any other materials within his cell must be approved by mental health staff. [UMF 8; UMF 45; UMF 46]. While Plaintiff alleges he spoke with Defendants Leslie, Biros, Cox, and Miller concerning his lack of a mattress, he concedes he was repeatedly told they tried to get him a suitable safety mattress. [UMF 12; UMF 13; UMF 14; UMF 15; UMF 16; UMF 18; UMF 19; UMF 20; UMF 21; UMF 22; UMF 23; UMF 24; UMF 26; UMF 28]. Specifically, Plaintiff concedes Defendant Leslie followed up and indicated he had been told no mattresses were available, even signing a document stating such. [UMF 13; UMF 14; UMF 15; UMF 16]. Plaintiff reports mental health staff informed him Defendant Shelton was trying to get mattresses for Plaintiff and other individuals. [UMF 18]. Further, mental health staff reported Defendants Cox,

Biros, and Lewis were having meetings and trying to get mattresses during this time frame. [UMF 22].

Furthermore, Defendants consulted with Pontiac administration about the mattress shortage at Pontiac in 2020. [UMF 34]. Pontiac generally receives its mattresses from the Illinois Correctional Industries Program ("ICI"); the mattresses are made by individuals in custody at another IDOC facility. [UMF 30; UMF 31]. However, because of the COVID-19 lockdowns at IDOC facilities, the ICI program was temporarily closed, leading to a mattress shortage. [UMF 32; UMF 33]. Defendants requested authorization from IDOC in Springfield to purchase mattresses from an outside vendor. [UMF. 34; UMF 35; UMF 36]. When those mattresses arrived, they were unacceptable and were sent back. [UMF 37; UMF 38]. New mattresses were immediately ordered and passed out to individuals in custody upon arrival. [UMF 39; UMF 40; UMF 41]. Even if Plaintiff did not have a mattress between September 6, 2020 and November 9, 2020, the record establishes Defendants responded by making some effort to prevent the harm, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844-45.

While Plaintiff contends eight other individuals were provided "regular mattresses," as discussed above, Plaintiff frequently exhibited suicidal tendencies and was restricted in property based on mental health staff's recommendations in an order to prevent self-harm or a suicide attempt. [UMF 3; UMF 4; UMF 8; UMF 42; UMF 43; UMF 45; UMF 46]. In these fact-intensive analyses, Courts should consider the context of an individual's behavior and other circumstances. *Bowers v. Pollard*, 602 F. Supp. 2d 977, 978-979 (E.D. Wisc. March 17, 2009) (analyzing *Gillis*, 468 F.3d 488). Here, mental health staff were monitoring and administering Plaintiff's watch status and property restrictions due to concerns of self-harm and suicide. [UMF 3; UMF 4; UMF 8; UMF 45; UMF 46]. Further, an unforeseen global pandemic was ravaging supply chains, within prison

settings and the outside world. Therefore, Defendants are entitled to summary judgment.

## II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM.

Prison officials violate the constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The deliberate indifference standard requires an inmate to clear a high threshold in order to maintain a claim for cruel and unusual punishment under the Eighth Amendment. *Dunigan ex re. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). "In order to prevail on a deliberate indifference claim, a plaintiff must show (1) that his condition was 'objectively, sufficiently serious' and (2) that the 'prison officials acted with a sufficiently culpable state of mind.'" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)).

A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Foulker v. Outagamie County*, 394 F.3d 510, 512 (7th Cir. 2005). Additionally, a medical condition is serious where the failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Gutierrez v. Peters*, 11 F.3d 1364, 1373 (7th Cir. 1997). Indications of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Gutierrez*, 11 F.3d at 1373.

"Deliberate indifference implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." *Thomas v. Walton*, 462 F.Supp.2d 786, 793 (S.D. Ill. 2006)

(citing *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985)). In other words, the Defendant "knows of and disregards an excessive risk to inmate health or safety." *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). Under this standard, mere negligence, even gross negligence, does not constitute deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Prison officials cannot be held liable for deliberate indifference if they either (a) did not know, or had no reasonable reason to know, of the substantial risk, or (b) responded by making some effort to prevent the harm, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844-45 (*Farmer* states that officials cannot be held liable when they "respond reasonably" to the risk. While this is certainly true, a reasonable response is not necessary to avoid liability, because the standard for deliberate indifference is stricter than the standard for negligence, or even gross negligence. *Johnson,* 433 F.3d at 1013.).

The Eighth Amendment does not require that prisoners receive unqualified access to health care. *Johnson*, 433 F.3d at 1013. They are entitled only to "adequate medical care" and reasonable measures to address substantial risks of serious harm – not to demand specific care or to receive the best care possible. *Id*. The Court is to look to the totality of care received in determining if a defendant was deliberately indifferent to the inmate's seriously medical needs. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

Prison officials are not held liable when they reasonably rely on the orders of medical personnel. In the context of an Eighth Amendment claim arising from the medical care of an inmate, a non-medical prison official is entitled to summary judgment when he reasonably responds to an inmate's complaint or grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition. *Johnson v. Doughty*, 433 F.3d 1001, 1010-12 (7th Cir. 2006). Further, "[i]f a prisoner is under the care of medical experts,

a non-medical prison official will generally be justified in believing that this prisoner is in capable hands." *Id*. at 1011 (citing *Spruill v. Gillis*, 372 F.3d 218 (3rd Cir. 2004)). The Seventh Circuit has recognized that a "jail official's [reliance] on the opinion of the doctors militates against a finding of deliberate indifference on the part of any jail personnel[.]" *Perkins v. Lawson*, 312 F.3d 872, 875-76 (7th Cir. 2002). Even if Plaintiff is able to show that medical personnel were deliberately indifferent to his serious medical needs, non-medical prison officials cannot be chargeable with the Eighth Amendment scienter requirement absent actual knowledge, or at least a reason to believe, that the care was inadequate. *Johnson*, 433 F.3d at 1010, n.9 (quoting *Spruill*, 372 F.3d at 236).

Defendants, as security personnel, are not responsible for providing direct medical care to prisoners. [UMF 29; UMF 46; UMF 52]. As such, Plaintiff did not receive direct medical treatment from Defendants. Further, the record reflects Plaintiff was continuously seen by medical and mental health staff at Pontiac during the applicable time frame. [UMF 47; UMF 48; UMF 49; UMF 50]. Further, Plaintiff was given two prescriptions by medical staff to address his pain. [UMF 50].

Based on the facts in the record and Plaintiff's own admissions, Plaintiff cannot produce evidence or demonstrate Defendants had personal knowledge of a substantial risk to Plaintiff's health or that Defendants disregarded such a risk. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim of deliberate indifference to a serious medical need.

### III.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Government officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 817, 818 (1982). To determine whether an official is entitled to qualified immunity, a two-

part inquiry is required: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Id*. at 202. An official who makes a reasonable mistake as to what the law requires is entitled to the defense of qualified immunity. *Id*. at 205.

The Court should look to controlling precedent within the Seventh Circuit and Supreme Court. *Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir. 2013). Further, the inquiry into whether or not a right is clearly established must look to particular conduct within the specific context of the case rather than a general proposition. *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015). Here, Plaintiff's claims arise from the fact he was without a mattress during a global pandemic, which resulted in supply chain shortages for the prison concerning access to mattress, including the specialized safety mattress Plaintiff required. [UMF 30; UMF 31; 32; UMF 33; UMF 35; UMF 36; UMF 37; UMF 38; UMF 39; UMF 40; UMF 41; UMF 42; UMF 43]. Defendants acted in accordance with established law by making efforts within their capability to request and/or provide a mattress. [UMF 12; UMF 13; UMF 15; UMF 16; UMF 18; UMF 20; UMF 22; UMF 28; UMF 34]. Therefore, Defendants are entitled to the protection of qualified immunity.

## CONCLUSION

In summary, the facts are *de minimis* and do not rise to the extreme level required for a constitutional deprivation. Defendants took action to address Plaintiff's concerns, even if the harm was not ultimately averted. Defendants were not deliberately indifferent to a medical need because Plaintiff was continuously provided with both medical and mental health care. Finally, Defendants

are entitled to the protection of qualified immunity. Accordingly, the Court should enter summary judgment in Defendants' favor.

WHEREFORE, for the above reasons, Defendants request summary judgment be entered in their favor and provide such further relief as this Court deems necessary and proper.

        Respectfully submitted,

        BRYAN BIROS, WILLIAM COX, ANTHONY LESLIE, DARRYL LEWIS, KYLE MILLER, and WILLIAM SHELTON,

        Defendants,

        KWAME RAOUL, Illinois Attorney General

Megan Ditzler, #6318052  
Assistant Attorney General     Attorney for Defendants,  
500 South Second Street  
Springfield, Illinois 62701     By: _s/Megan Ditzler_  
(217) 782-5819 Phone         Megan Ditzler, #6318052  
(217) 524-5091 Fax         Assistant Attorney General  
E-mail: megan.ditzler@ilag.gov

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CLARENCE BRITTEN, #Y32384 | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 21-1035-SLD |
| vs. | ) |
| | ) |
| WILLIAM COX, et al., | ) |
| | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2022, I electronically filed the foregoing, *Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment*, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

NONE

and I mailed by United States Postal Service, the document to the following non-registered participant:

Clarence Britten, #Y32384
Menard Correctional Center
Individual in Custody Mail/Parcels
711 Kaskaskia Street
Menard, IL  62259

s\ Megan Ditzler
Megan Ditzler, #6318052
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62701
Phone: (217) 782 9026
Fax:    (217) 524-5091
E-Mail:  megan.ditzler@ilag.gov